## Richmond.

## MELENDY & RUSSELL v. BARBOUR, RECEIVER.

### February 7th, 1884.

1. APPELLATE JURISDICTION—*Decree against receiver.*—One aggrieved by decree of court which appointed the receiver for or against whom the decree is rendered, may appeal in a proper case to this court, even if the receiver cannot question the decree of the court appointing him. *Page* v. *Crockett,* 27 Gratt. 735.

2. RAILWAY RECEIVERS—*Suit at law.*—The established rule is that where a railway company is in the hands of a receiver appointed by a court of equity, the receiver cannot be sued at law without the permission of the appointing court. *Barton* v. *Barbour, Receiver,* 14 Otto, 126.

3. IDEM—*Liability for negligent injury.*—Such receivers may be held responsible for the damage actually sustained by a shipper of freight, through the negligence of the receiver's agents and employees, in any case in which the company could be so held.

4. IDEM—*Conflict of evidence—Issue—Case at bar.*—Where upon petition filed in suit wherein a railway company had been put into a receiver's hands, for damages sustained by petitioner by the negligent killing of the petitioner's horse, alleged to have been of the value of $50,000, a reference had been made to a commissioner to ascertain and report the value of the horse, the commissioner, having taken all the evidence procurable, reported the horse to have been worth $40,000; but the court recommitted the report, and the commissioner took additional evidence, and reported the horse to have been worth only $1,000; the additional evidence does not warrant the last report, yet the evidence offered by petitioner as to the speed and celerity of the horse does not sustain his claim to have the first report confirmed.

HELD:

 Both reports should be set aside and an issue directed to be tried by a jury at the bar of the court below to ascertain the amount of the damages sustained by the petitioner.

Appeal from decree of circuit court of Alexandria city, entered May 28th, 1880, on a petition filed in the chancery cause of *Graham* v. *Washington City, Virginia Midland and Great Southern Railroad and others,* wherein said railroad had been placed under the management of John S. Barbour as receiver. The petition was filed by A. B. Melendy and T. J. Russell. Its object was to recover damages for the killing of their race horse, "Bristow," which they valued at $50,000, by the negligence of the receiver's agents and employees. The circuit court refused to allow petitioners to sue the receiver at law, but directed a commissioner to ascertain and report the damage received. Commissioner took evidence, and reported the horse to have been worth $40,000. The circuit court recommitted the report without passing on the defendant's exception thereto. Commissioner took additional evidence, and reported the value of the horse at only $1,000. This report the court confirmed, despite the petitioners' exceptions thereto, and decreed that the receiver pay out of the funds in his hands as such to the said petitioners, the sum of $1,000, with interest thereon from October 13th, 1877, with their costs about their said petition expended. From this decree the petitioners obtained an appeal to this court.

The facts are fully set forth in the opinion.

*John W. Daniel,* for the appellants.

1. Suit is maintainable by a shipper, or his agent, to whom bill of lading is issued.

2. A carrier of freight or passengers is bound to carry safely.

3. If carrier does not carry safely, the burden of proof is, in all cases, on him to prove that he was not negligent, and to exonerate himself.

4. He can only exonerate himself, in general, by show-

ing that loss resulted from act of God, the public enemy, or the shipper himself.

5. The carrier may limit his liability as an insurer of safe carriage.

6. But he cannot exempt himself from, or limit, his liability by any contract, for loss resulting from his own negligence.

7. Public policy interdicts any traffic in, or contract respecting, negligence.

8. Free carriage of freight or passengers in no wise alters the law respecting negligence by which damage results.

9. In brief: a carrier may by contract exempt himself from liability, or limit his liability, for losses resulting from the acts of strangers; but he can do neither in respect to the wrongful acts of himself or his agents.

10. A party who, by negligence, destroys property must pay its full value.

11. A receiver's earnings are liable for payment of losses occasioned by negligence of his employees.

*Charles M. Blackford*, for the appellees.

It is admitted that the receiver may be held responsible in any case which a company could be so held. Whether the facts of this case render him liable will be considered hereafter.

We will examine the questions in the following order:

I.—IN REGARD TO THE TRUE VALUE OF BRISTOW.

In the court below the appellants demanded *fifty thousand dollars*. The court awarded them *one thousand*, and they appealed.

To be worth over $1,000 a horse must be a very remarkable animal. Few horses bring that price.

Bristow first saw the light of day somewhere in the rural districts of East Tennessee. Of his early colthood history is silent, and the first glimpse the testimony gives of his career is found in the statement that when two and a half years old he was purchased by one of the present claimants (T. J. Russell) for the sum of $125. He was then christened "Little Frank," by which name he first appeared in public as a pacing gelding at Knoxville, Tennessee, in October, 1874, winning small purses, in doubtful heats, in two minutes and fifty-eight seconds, or distanced by "Little Nell" in two twenty-eight. His trainer at this time, Jack Lowe, says he was not then "a valuable track horse" because of his stubborn disposition and his inclinations to balk, and, further, because he "did not consider he had speed enough"; subsequently, he regarded him unreliable, because he was a converted pacer. At this time he says his owner asked $500 for him, but he did not consider him worth it.

After this first public appearance "Little Frank" retired to the shades of Morristown, and is not heard of again until the fall of 1876, when he appears unsuccessful as a contestant for the small premiums at the Bristol fair, when Andy Sprague, who has been training horses for seventeen years, says his fastest speed was two fifty-four; that he was a "bad actor" that "broke very badly," and that he would not have given two hundred dollars for him.

Beaten and disgraced, again he retired, and having proved so bad a speculation as a pacer, his owner, Mr. Russell, determined to call in the aid of Mr. A. B. Melendy for the purpose of giving him some value by "converting" him into a trotter. So hopeless did both these trainers regard this effort, that Melendy would only undertake the job on condition that he should have one-half of the horse as a gift—a proposition which Russell gladly accepted.

So "Little Frank" was sent over to A. B. Melendy, who

put him under the charge of his boy, A. R. Melendy, then seventeen years old, on Cain's track, which seems to have done duty alternately as a race course and a cornfield. He remained at Cain's from April, 1877, until the fall, when he started on the tour which was, according to the sanguine and posthumous views of the frequenters of old Cain's cornfield, to stamp him as a "world beater," a "trotting phenomenon," a "terribly powerful horse," a bonanza whose value should suddenly be developed from $200 to $50,000—indeed, to $70,000—according to Gov. Senter, who never saw Bristow but once and then under the saddle, and is now paraded as an expert in jockeyism, because he once saw a horse race on Coney island.

After lengthy discussion of the evidence concerning the value of the horse, the counsel concludes that subject thus:

On the evidence I respectfully submit, the court below went very far in fixing the value of Bristow at one thousand dollars. Six hundred would have been nearer his value.

II.—THE MEASURE OF THE LEGAL RESPONSIBILITY OF RECEIVER.

It is not denied that the funds in the hands of the receiver should be held responsible to any claim for damages arising under the receivership, which would be good against the company had it not passed into the hands of the receiver; in other words, that the property has no immunity from such responsibility by reason of the fact it is under the control of a receiver.

But what is his responsibility as to this claim? The contract is the measure of liability, and this assertion is made with a full knowledge of all the learning and current of decisions which declare against the right of a carrier to limit his liability as against negligence.

In this case, the two horses were taken to the Virginia

Midland agent at Lynchburg and shipped with the under-standing that the stock was to be shipped free; but to pro-tect the receiver against fraud, it was also agreed that the shipper should pay freight one way, and that upon his returning the stock over the road after exhibiting, the freight so paid should be returned.

For the sake of the argument, we will proceed for the present under the supposition that there was negligence—a matter of which we will inquire hereafter—and taking this for granted, let us inquire into the measure of the legal responsibility of the receiver.

This horse was shipped—as any other horses were shipped over that line—without any notice being given of its pos-sessing any extraordinary virtues or unusual qualities which rendered it more valuable than any other horse of its age, shape and build, and under a contract which contained this clause :

" The party of the second part (Melendy) agrees that the party of the first part (the receiver) shall not, under any circumstances, nor for any cause, be held liable beyond the sum of $200 for injury to or loss of any single animal car-ried pursuant to this agreement, although the actual value of that animal may exceed that amount."

Such a clause is not repugnant to the law of carriers. It is based on common sense. A shipper carries a horse to the agent of a railroad to be sent to some distant point; there is nothing about him to excite remark or raise any pre-sumption of unusual value, and the shipper sends him at the same rates charged for the most ordinary hack; the horse is killed, and the shipper steps forward and says that was Parole or Rarus, or the winner of the last Derby, or Bristow; pay me $70,000. Would it be reasonable that the railroad company, under such circumstances, should be re-sponsible, even without any such clause of limitation as that above ? Where such an unusual risk is to be assumed

there must be unusual compensation, and there must be notice so there may be unusual care.   Hence, to protect themselves, the railroad companies have inserted such clauses as that quoted above, whereby notice is given to the shipper of what the legal rights of the carrier are, so that he may make such arrangements and contracts as will protect him in transporting stock of fancy value.

Common sense, as is apt to be the case, is sustained by the courts and jurists.   Says Greenleaf—(2d Evidence, § 215):

"It is now well settled that a common carrier may qualify his liability by a general notice to all who may employ him, of any reasonable requisition to be observed on their part, in regard to the manner of delivery and entry of parcels, and the information to be given to him of their contents, the rates of freight and the like ; as, for example, that he will not be responsible for goods above the value of a certain sum, unless they are entered as such and paid accordingly."

This is an exception to the doctrine that a common carrier cannot limit his liability by notice, and is borne out by decisions.   See Lawson on Contracts of Carriers, p. 87.

Notices of this class were early and properly held valid. The liability of a common carrier being founded on his reward, he is entitled to give notice that he will not be answerable for valuable goods unless he is informed of their value.   His warranty and insurance is in respect to the reward he is to receive, and the reward ought to be proportionate to the risk, for it is the reward which makes the carrier answerable (Lord Mansfield in *Gibbon* v. *Paynton*, 4 Burr. 2298); and if the shipper ships with such notice as was given in this case without notifying the carrier of fancy value, he must be restricted in the measure of his recovery to the damages liquidated in the contract at $200

for each animal—a sum fixed as proportionate to the reward stipulated. The American courts hold the same doctrine, but place this exception to their general rule, more on the ground of the right of the carrier to have this kind of information than on the English argument as to the consideration :

"Where the shipper knows that the carrier demands and has a right to demand information concerning the value of his goods, silence on his part is the same as an assertion that his goods are of no greater value than that suggested by the carrier. The carrier is thereby not only deprived of his adequate reward, but is misled as to the degree of care and circumspection which he should exercise. Of notices of this description it remains to be said that courts and juries are liberal in inferring knowledge on the part of shippers, from the fact of their publication." (Lawson on Contracts of Carriers, 89).

In a New Hampshire case in a suit against a railroad company, the company offered to prove a notice given, which exempted them from being liable for all losses not caused by themselves or agents, and also providing that they *" should not be liable for a greater amount than* $100 *on any one package or article* unless the value thereof be disclosed and an extra amount paid therefor."

This notice was shown to have been known to the plaintiff, but his assent to the terms was not shown. It was held that the notice was not binding on the plaintiff except as to the clause limiting the amount of the liability.

Perley, J., said:

"We don't mean to hold that there are no cases in which the carrier may, by notice, define and qualify his responsibility. It may be quite reasonable that he should insist on proper information as to the value of the article which he carries. This would not seem to be any infringement of the principle of the ancient rule; he must have a right to

know what it is he undertakes to carry and the amount and extent of his risk. We can see nothing that ought to prevent him from requiring notice of the value of the commodity delivered to him when, from its nature, or the shape and condition in which he receives it, he may need the information, nor why he should not insist on being paid in proportion to the value of the goods and the consequent amount of risk." *Moses* v. *Boston R. R. Co*, 24 N. H. 71.

In *Magnin* v. *Dinsmore*, decided May 25th, 1875, by the court of appeals of New York (62 New York, 35), it was held that " Where a carrier, by his contract, limits his liability to a specified amount, if the value of the property is not stated by the shipper, the goods are of greater value than the amount specified, silence alone on the part of the shipper as to the real value, although there be no inquiry by the carrier and no artifice to deceive, is fraud in law which discharges the carrier from liability for ordinary negligence. Where the shipper accepts carriage upon the terms of a limited liability, silence is the same as an assertion of little value, and the carrier is not only thereby deprived of his adequate reward, but is misled as to the degree of care and security which he should provide." See also *Judson* v. *Western R. R. Co.*, 6 Allen, 485.

In *Hart* v. *Pennsylvania R. R. Co.* (7 Fed. Reporter, 630), it is held that by having a shipper sign a bill of lading, fixing the value of property shipped at a specific amount, a common carrier may limit its liability to that amount in case of loss in consequence of its gross negligence. The authority is given in these words:

" Where five horses were shipped by rail, and the bill of lading was signed by both the carrier and shipper, and provided, among other things, ' that the carrier assumes a liability on the stock to the extent of the following agreed valuation: if horses, not exceeding $200 each,' . . . and

through the carrier's gross negligence one of the horses,. alleged to have been worth $15,000, was killed, and the others injured.   Held in a suit by the shipper for damages, that his recovery could not exceed the amount fixed in the bill of lading."   See S. C., reported briefly in 1 Am. and Eng. R. R. Cases, 614.

I assert, therefore, that both reason and authority sustain the assertion in this case that $200 is the utmost sum which under any circumstances the court below should have allowed as compensation for the killing of Bristow, and that the court below erred in allowing more.

RICHARDSON, J., delivered the opinion of the court.

The object of the proceeding, now under consideration, in. the court below was to recover the value of a race-horse, "Bristow," killed on said railroad on the 13th day of October, 1877, while in course of transportation from Lynchburg to Culpeper.   The horse was the joint property of the appellants, Melendy and Russell.   To recover his value they filed their petition in the above-styled cause, in which the said road had been previously put in the hands and under the management of John S. Barbour, as receiver; and describing their said horse as a celebrated race-horse, of rare beauty of appearance, and speed and bottom, valued by experts at from forty to seventy thousand dollars, and estimated by the petitioners, the owners, to have been worth, at the time he was killed, not less than $50,000,. which amount they claimed the right to recover out of the earnings of said company, in the hands of said receiver; they alleging that said horse was killed by the gross negligence and carelessness of the agents and employees of said receiver, in whose care he was.   And for the damages thus. sustained the petitioners prayed that they be permitted to

enter suit against said receiver along the line of said road at the point most convenient and accessible to them.

On the 21st day of November, 1878, an order was entered in said cause refusing the prayer of the petitioners for leave to sue at law; and as to the other matters therein contained the said petition was referred to the Master Commissioner Sheppard, for a report thereon. This order having been made, the depositions of a number of witnesses were taken, some of whom lived in each of the States of Tennessee, Maryland and Virginia. On the 24th day of May, 1879, and before all the testimony on either side had been taken, the commissioner, under his report fixing the value of the horse "Bristow" at $40,000—that being, in the language of the commissioner—the lowest estimate fixed by either of the witnesses who testified as to the value of the horse; and this, the commissioner in substance says, was done after looking in vain to every source of information then accessible for something to lessen the power of speed and value of the horse.

To this report of the commissioner, the receiver excepted, and on the 30th day of May, 1879, the cause coming on again, the court, without passing upon said exceptions, recommitted the matter to said commissioner for further consideration and report, with leave to either party to take further evidence, and submitting said exceptions to said commissioner. Accordingly the case was reopened before said commissioner and other evidence taken, and on the 3d day of January, 1880, said commissioner again reported. In this second report the commissioner says: "Since the recommittal to him, he has taken the depositions of three witnesses, experts in the training of trotting horses—to-wit: Joseph Halstead, Dan Stever and H. B. Holton—that they were examined to ascertain what would be a fair value for the horse 'Bristow,' taking into consideration the facts connected with his history as proved by the peti-

tioners' witnesses." And reviewing the whole case with the light thrown upon it by these witnesses, the commissioner further says: "Your commissioner is satisfied that the value as put upon the horse by the witnesses who testified for the petitioners was a highly exaggerated one. Your commissioner thinks, from a careful examination of the testimony on both sides, that the sum of $1,000 was a fair and reasonable price for said horse at the time he was killed," &c.

This report was excepted to by the petitioners, because the estimate of value fixed by the commissioner was far below what the evidence warranted. But the court overruled the exceptions, confirmed the report, and gave judgment in favor of the petitioners against the said receiver for the said sum of $1,000, with interest from the 13th day of October, 1877. And from that decree the case is here on appeal.

Before proceeding to consider the case on its merits, it is necessary to dispose of a preliminary question raised by counsel for the appellee, to the effect that inasmuch as the receiver, who is but the hand of the court whose judgment is complained of, cannot appeal, the appellants ought not to be entertained on their appeal here, as the railroad company, whose rights are involved, cannot be heard to question the judgment of the court which appointed said receiver.

Upon general principles, this question would seem to be easy of solution. If it could be true that because the receiver, as the agent of the court which appointed him, cannot question, by appeal, the judgment of that court against him, that, therefore, the appellants cannot question, on appeal, the propriety of the judgment of that court against them, then it would seem necessarily to follow that a company which happens to be in the hands of a receiver would be in effect exempted from liability, or subject only to

such liability upon its contract, or for wrongs committed by it, as its friendly custodian, the court might elect to enforce. No such manifest injustice could be tolerated in any court. It sometimes happens, under peculiar circumstances, that one party can appeal to this court when the other party cannot. For instance, it is provided by our constitution that this court shall not have jurisdiction in civil cases where the matter in controversy, exclusive of costs, is less in value or amount than five hundred dollars, except in certain specified cases. Yet, where the plaintiff in his declaration or bill sues for money, and claims more than five hundred dollars, but by the ruling of the court obtains a judgment for less, he is entitled to an appeal, because as to him the matter in controversy is the sum claimed; but if in such case the plaintiff is satisfied, the the defendant cannot appeal, because as to him the only matter in controversy is the judgment, which is less than the amount prescribed for the jurisdiction of this court. *Gage* v. *Crockett*, 27 Gratt. 735.

No good reason can be perceived why the same rights of action may not be maintained against receivers, as a general rule, that might have been maintained against the corporation or person to whose estate and rights the receiver succeeds. In conformity with this general doctrine, it is held, where the affairs of a railway company have passed into the hands of a receiver, who is operating the road under the direction of the court, having exclusive charge of its management and of the employment of operatives and employees, the entire control of the company having passed to the receiver as fully as it was before exercised by the officers of the road, the receiver may be held answerable in his official capacity for injuries sustained, in the same manner that the corporation would have been liable. High on Receivers, § 395, and numerous authorities there cited. It would be idle to talk about holding a rail-

road company responsible for wrongs done or injuries inflicted if the judgments rendered by the court which happened to appoint the receiver cannot be reviewed on appeal. We are therefore of opinion that the objection is not well taken.

The next question is as to the refusal of the court below to allow the petitioners to sue at law.

It is aptly and forcibly said by counsel for the appellants that "it is an anomalous thing for an action of tort to be tried by a commissioner of a court; and that the policy and decisions of the courts tolerating such a practice is tending to strip the people of their rights to trials by jury of matters of fact; that the disposition of a single judge to monopolize legal power in his own hands and to cut up by the roots the salutary principles of common law and equity practice, has been greatly stimulated by the growth of the great corporations which now dominate state and nation. A single judge, a single commissioner, acting in an atmosphere impregnated by the strongest influence, intellectual and social, that a great corporation can throw around him, is not better fitted to do justice between such a corporation and its adversaries, in matters involving questions of fact, than a jury summoned from the body of the people."

This criticism of counsel is a just one and has my hearty approval. The rule, however, as established in this country is adverse to my own view, and the majority of this court being opposed to the establishment of a different rule in this State, I can but yield to their opinion as fixing the law here. The rule, sanctioned by the weight of authority in this country, is, that where railway company is in the hands of a receiver, by appointment of a court of equity, the receiver cannot be sued at law without the permission of the court making such appointment. *Wiswall* v. *Sampson*, 14 How. 65; *Davis* v. *Gray*, 16 Wall. 263; *Barton* v. *Barbour, Receiver*, 14 Otto, 126. In the last named case it is dis-

tinctly held that the rule that a receiver cannot be sued without leave of the court of equity which appointed him, applies to suits against him on a money demand, or for damages, as well as to those the object of which is to recover property which he holds by order of that court; and that in a case before such court involving disputed facts, that court may, in a proper case, either of its own motion or on the prayer of the parties injured, allow its receiver to be sued at law, or direct the trial of a feigned issue to settle the facts; and that the determination by a court of equity, according to its own course and practice, of issues of fact growing out of the administration of trust property in its possession, does not impair the constitutional right of trial by jury.

The supreme courts of Wisconsin and Iowa have, however, departed from this doctrine, and hold that in all cases where there is no attempt to interfere with the actual possession of the receiver, a suit may be prosecuted against him in any court of competent jurisdiction without the permission of the court from which the receiver derived his appointment. This was ruled by the supreme court of Wisconsin in a case in which an action at law was brought in the State court against a receiver who was operating a railroad under the appointment of the district court of the United States, for personal injuries occasioned through the negligence of his servants. *Kinny* v. *Crutcher*, 18 Wis. 74. And the doctrine laid down in that case was cited and approved in the recent case of *Allen* v. *Central Railroad of Iowa*, 42 Iowa, 683. However, the weight of authority is the other way, and although the rule as established in a large class of cases, amounts practically to a denial of justice, and the ousting of courts of law of their rightful jurisdiction, it is so settled and must prevail; therefore, we are of opinion that the court below did not err in refusing leave to sue the receiver at law.

It is conceded by counsel for the appellee, that the killing of the horse, Bristow, was owing to the negligence of the receiver's agents and employees, and that he, as receiver, is liable for the damage actually sustained; therefore, the question need not be considered whether, by reason of the fact that at the time the horse was killed he was being shipped over said road free of charge, could exempt said receiver from liability.

We come now to the important enquiry, What is the case upon its merits? or, in other words, what decree can this court, upon the evidence, safely proceed to enter?

This proceeding was instituted for the recovery of $50,000 from the receiver of a railway company, that being the amount which the petitioners say they have been damaged by the culpable carelessness of the agents and employees of said receiver, resulting in the killing of a race horse (" Bristow") belonging to them. Such a price or value fixed upon a horse is, ordinarily speaking, in the language of the commissioner in his first report in this case, calculated to strike the mind with " amazement." We do not pretend to say or even intimate that no horse, more especially the horse in question, would command that sum; on the contrary, it appears that horses possessing, more or less, the qualities attributed to this horse, have commanded even larger figures. It is, nevertheless, true that to be of such extraordinary value, he must have possessed the extraordinary qualities, and had, at least, a reasonably well-established reputation therefor.

The horse (" Bristow") is described in the record as a "blooded bay" from seven to nine years old, with pluck and bottom—in fact, having all the qualities of " beauty of appearance, speed and endurance, which fitted him for a brilliant career on the turf "—in short, "a celebrated racer."

Is he proved to have been such? or, in other words, is there a clear preponderance of evidence to that effect? If

there is, then the owners are entitled to recover such amount as the horse is proved to have been worth, it being conceded in argument that the killing of the horse was attributable to negligence on the part of the defendant's agents and employees. Let us examine the evidence and determine.

We have seen that Commissioner Shepperd was so impressed with the evidence for the petitioners that in his first report he fixed the value of "Bristow" at $40,000. Was he justified in this by the evidence? To answer this question it is necessary to make a brief summary of the substance of the evidence. This horse was first a pacer, and afterwards converted into a trotter. As a pacer he was entered at fairs at Bristol and other places in the State of Tennessee, at which he won some small premiums; his last appearance as a pacer being at Bristol in the fall of 1876, at which time his owner, the petitioner, Russell, parted with a half interest in him to the petitioner, Melendy, and the two, as joint owners, determined to convert him from a pacer to a trotter, and to that end put him in charge of A. R. Melendy, a son of the petitioner, Melendy, at Cain's track, in Greene county, Tennessee, where, during the spring and summer of 1877, he was trained as a trotter. It is impracticable, as well as unnecessary, to enter into a full detail of the evidence. It is only necessary to refer to its character and tendency so far as may be necessary to vindicate the propriety of the conclusion arrived at by this court.

There are nine witnesses relied on by the petitioners. These witnesses were, in the main, introduced as experts. They were stock breeders and trainers of fast horses, or persons who had had opportunities of becoming more or less familiar with the speed and other qualities which determine the value of a fast trotting horse. These witnesses had all seen "Bristow"; some of them not more than once, and then when trotting at the Bristol fair in the fall of 1877, his first and only appearance as a trotter in a public con-

test.   One of these witnesses (ex-Governor Senter, of Tennessee) never saw the horse but once, and then under the saddle—never saw him trot; but in his deposition subsequently given in this cause, he estimates the value of Bristow at $70,000; this estimate being based in part on his recollection of having seen the horse, and upon the description of his speed being at the rate of one mile in two minutes and sixteen seconds.   The other witnesses for the petitioners all testify to the extraordinary speed of this horse as a trotter; but none of them, except the witness Ephraim Moore ever actually timed the horse, and he timed him for a half mile, which he says the horse made in one minute and eight seconds, by a common silver watch—a test which could not be claimed to be accurate in a matter of so much nicety, and one in which the fraction of a second might be of great importance.   This witness (Moore) says: "The horse (Bristow) developed speed very fast.   I timed him about a week and a half before he left for the fall races, and he made one half mile in one minute and eight seconds.   I may have made a mistake, but don't think I did"   And all these witnesses for the petitioners, who testified at all as to value, estimated this horse at from forty to seventy thousand dollars.

Turning now to the evidence relied on by the defendant to reduce the damages claimed by the petitioners, we find it to consist of the testimony of witnesses, claimed to be familiar with horse training and fast trotting horses, and examined on behalf of the defendant as experts.   Neither of these witnesses (all of whom lived in or near the city of Baltimore) had ever seen Bristow.   In substance, the hypothetical question is put to each of them as to the value of a converted pacer, "with a record of 2.56, but claimed to have shown a 2.20 or 2.25 gait."   In response these witnesses respectively put such a horse at very low figures—one at from three to six hundred dollars; one at

two hundred and fifty dollars; and the other at from three to four hundred dollars. When, however, on cross examination, a horse, such as Bristow is claimed to have been, was described to them, and their estimate of the value of such a horse asked for, they put it at from ten to twenty thousand dollars. Upon this evidence, and a review of the evidence for the petitioners, the commissioner concluded that his former estimate was very extravagant, and he, in his second and last report, which was adopted by the court, reduced that estimate to $1,000. It is perfectly apparent that this estimate is not to be accounted for, and is not warranted by anything in the evidence of these three experts, examined on behalf of the defendant. Nor is it warranted by the most rigid scrutiny of the evidence on the part of the petitioners.

Let us, then, turn to the evidence for the petitioners, and see if it warrants the high value placed on the horse in question by the petitioners, and testified to by the witnesses examined on their behalf.

If we look only to the general declarations of these witnesses as to value, it must be admitted that there is a most decided preponderance of testimony in favor of the extraordinary value of this horse. Their evidence unquestionably is that Bristow was an extraordinary horse, and so far would seem conclusive as to the question of attaching extraordinary value to him. But this testimony, when examined closely, does not possess all the elements essential to a case so extraordinary in its character.

It must be remembered that this claim, so many times exceeding all our ideas of the value of a horse, rests distinctly upon the idea that this horse was a celebrated racer, with speed as a trotter at the rate of one mile in two minutes and sixteen seconds. The value of such a horse is not to be measured by the ordinary horse-market, but by the ruling prices in the extraordinary market, among

sportsmen and turfmen, who constitute a fancy market for horses possessing the qualities of speed and endurance which fit them for brilliant careers as racers. Does this evidence on the part of the petitioners sufficiently establish the speed claimed for this horse? We think it does not. Certainly not so clearly as to enable this court safely to say that the petitioners are entitled to the damages claimed, or to the amount fixed by either one of the witnesses. Nor does it appear that, upon this all-important point, the best evidence was produced of which the case admitted. Let us see. J. S. Nielson, after describing the horse, says: " Mr. Melendy brought him (Bristow) there (Cain's track) in the spring to train, and I saw him frequently, and he improved rapidly, and seemed willing to go, and was ambitious; he improved in speed very fast, was much faster when he left than when he came. I never timed him myself; saw others time him, and he trotted faster than any horse I ever saw trot . . . ." This witness was a stock-breeder, and himself had horses in training for the turf. He, however, did not time this horse, but saw others time him.

A. R. Melendy, the son of one of the owners of " Bristow " and the witness who was also the trainer of him as a trotter, says: "About the last of June (1877) I had ' Bristow' timed a mile, which he made in two minutes and thirty seconds; he was timed very often after that by different parties visiting the track, and they always reported that he made a mile in less than 2:30. About the middle of September, I believe it was, I prepared him for a half mile trial, and he was timed by Mr. Moore (Ephraim Moore, before referred to), and made it in one minute and eight seconds." Here are two witnesses who tell of Bristow's great speed as a trotter, but they fail to inform us what that speed was. They both say they never timed him, but saw other persons, various other persons, time him; but those persons,

except, it maybe, Ephraim Moore, were not examined. The witness, Moore, did time him by a common silver watch for a half mile, which he says Bristow made in one minute and eight seconds. Add to this the testimony of the witnesses who saw Bristow at the Border fair at Bristol, in the fall of 1877, in his first and only appearance in public as a trotter, when he made the magnificent burst of speed which caused one of them to declare him the best horse in the south, and another to speak of him in enthusiastic terms as a trotting phenomenon—a world beater, &c.; and it must be admitted that in all probability Bristow was, in point of speed and endurance—the requisite turf qualities— a horse far above ordinary, and possibly equal to the best and fastest of his kind; yet the difficulty still is in the way —his rate of speed is not accurately ascertained to be such as to entitle his owners to the amount claimed; is not so definitely fixed as to enable this court, looking only to the evidence, to say what his rate of speed was, and as a consequence, what damage has been sustained by the petitioners by reason of his loss to them. In this case, that which alone could entitle the petitioners to recover the extraordinary value claimed is matter of essential description— the speed and endurance this horse is claimed to have possessed, and as the evidence shall establish or not this matter of essential description, the damages sustained ought to be measured.

Upon the whole case, the second report of the commissioner not being warranted by any evidence in the cause, the exceptions thereto by the petitioners ought to have been sustained, and the matter recommitted to the commissioner, with instructions to take further testimony, as either party might desire; or else, as a better and safer course, an issue should have been directed and tried by a jury, under the supervision of said circuit court of Alexandria

city, as to the question of damages involved. And it being impossible for this court, in the state of the evidence in the cause, to say what amount of damage has been sustained by the petitioners, we are of opinion to reverse and annul so much of the said decree of the court below, rendered on the said 28th day of May, 1880, in the case of *Graham* v. *Washington City, Virginia Midland and Great Southern Railroad and others,* as refers to the said claim of the petitioners, Melendy and Russell, and remand the cause in that respect to said circuit court, with instructions to direct an issue in said cause, to be tried by a jury in the usual way in the said circuit court, to ascertain the damages to which the petitioners are entitled, at which trial either party may introduce the depositions now in the cause, taken on their behalf, respectively, or retake them, as they may desire.

The decree was as follows:

This day came the parties, by their counsel, and the court, having maturely considered the transcript of the record of the decree aforesaid, and the argument of counsel, is of opinion, for reasons stated in writing and filed with the record, that the said decree of the circuit court of Alexandria city, rendered on the 28th day of May, 1880, in the cause therein pending in the name of *Graham* v. *Washington City, Virginia Midland and Great Southern Railroad,* is, in so far as it affects the claim of the petitioners, Melendy and Russell, erroneous. It is, therefore, decreed and ordered that the same to that extent be reversed and annulled, and this cause be remanded to the said circuit court of Alexandria city, with instructions to the said court to frame an issue in the cause, and to impanel a jury to try the question as to the damages incurred by the appellants through the negligence

of the defendant company, and otherwise proceed in the cause in order to a final decree therein, in accordance with the foregoing opinion of this court and the views herein, and that the said appellants, Melendy and Russell, recover of the appellee, the said receiver as such, their costs by them expended in the prosecution of their appeal aforesaid here. Which is ordered to be certified to the said circuit court of Alexandria city.

DECREE REVERSED.